IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRIS CHELIOS, DUANE ROLOSON, and TRENT KLATT, | )<br>)<br>) |
| Plaintiffs, | ) Civil Action No.: 06 C 5333<br>) |
| v. | ) Suzanne B. Conlon, Judge<br>) |
| NATIONAL HOCKEY LEAGUE PLAYERS' ASSOCIATION, TED SASKIN, TREVOR LINDEN, VINCENT DAMPHOUSSE, BOB BOUGHNER, and BILL GUERIN, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This case arises from the ashes of a protracted labor dispute between the National Hockey League ("NHL") and the National Hockey League Players' Association ("the Association"), which ultimately lead to the cancellation of the 2004-2005 NHL season. The dispute ended with the ratification of a new collective bargaining agreement. Chris Chelios, Duane Roloson, and Trent Klatt, members of the Association's executive board, bring suit against the Association, its current executive director, Ted Saskin, its president, Trevor Linden, and members of its executive committee for breach of contract, violations of the Labor-Management Reporting and Disclosure Act, fraudulent misrepresentation, conversion, breach of good faith and fair dealing, and for an accounting. Plaintiffs allege defendants improperly took control of the Association, negotiated a "hard" salary cap into the collective bargaining agreement against the players' will, misrepresented the nature of the salary cap to obtain ratification, and misused funds. The Association moves to dismiss on *forum non conveniens* grounds. Alternatively, it moves to dismiss the fraudulent misrepresentation count for failure to plead with particularity. The individual defendants move to dismiss for lack of

personal jurisdiction. For the reasons set forth below, the defendants' motions are granted and the case is dismissed without prejudice.

## BACKGROUND

The facts are drawn from the complaint. The court accepts all well-pleaded allegations as true for purposes of the motions to dismiss. *See Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005). The Association's membership is comprised of roughly 700 NHL players on 30 teams throughout the United States and Canada. One purpose of the Association is to "negotiate improvements in conditions of employment for National Hockey League players." Compl. at Ex. 1. Accordingly, a major role of the Association is to bargain with the NHL regarding players' salaries and labor contracts, including the collective bargaining agreement in dispute during the 2004-2005 season.

The relationship between the Association and its members is governed by the Association's constitution. The constitution provides that one player from each of the 30 NHL teams shall act as a player representative. Each player representative is elected by his team to serve a two-year term on the Association's executive board. The executive board is the Association's governing body; it directs the Association's affairs and establishes policies necessary to carry out the Association's purposes. The board is run by officers drawn from and elected by a majority of the player representatives. Officer elections are conducted by secret ballot at annual executive board meetings. Officers serve two-year terms. Also on the executive board is an executive director, serving *ex officio*, who implements the Association's policies, maintains its permanent office, and directs its affairs subject to executive board approval. The executive director is nominated by the board and elected by secret ballot by a majority of the board members. The terms of the director's employment

2

are determined by the board. *See* Compl. at Ex. 1.

The gravamen of the complaint is that defendants violated the constitution by taking control of the Association, negotiating a collective bargaining agreement against the players' interests, and misrepresenting the information to benefit themselves. Specifically, plaintiffs contend that in July 2005, during the midst of the labor dispute with the NHL, Ted Saskin, then senior director of business affairs and licensing, "displaced" Bob Goodenow as executive director. *Id.* at ¶ 29. Saskin, aided by Linden, the Association's president, induced Goodenow to resign his position by offering him an $8 million buy-out. The buy-out was not known or authorized by the executive board and was in contravention of the constitution. On July 28, 2005, Saskin installed himself as executive director without a vote of the board, again in violation of the constitution. When board members objected, Saskin and Linden held a perfunctory election. Saskin's name was the only one on a mail-in ballot and the election was not secret. Saskin used this manipulated election process to legitimize his position as executive director.

As director, Saskin became the primary spokesperson for the Association in the ongoing collective bargaining negotiations with the NHL. During the negotiations, Saskin agreed to include a salary cap system in the collective bargaining agreement. Saskin did this against the express instructions of the executive board that no cap be negotiated. Saskin and the other defendants then pushed through ratification of the agreement by calling for a vote less than twelve hours after presenting the issue to the players. The agreement consisted of six hundred pages and contained complex descriptions of salary cap and escrow systems. It was impossible for players to review the agreement in detail prior to the vote. Further, defendants allegedly concealed "side letters" that significantly altered the agreement's terms. The version of the agreement presented to the players,

3

and described in a summary provided by Saskin, contained a "soft" salary cap system. But the side letters altered that system into a "hard" salary cap scheme. The players ratified the collective bargaining agreement based on defendants' misrepresentations.

The complaint alleges Saskin and defendants committed additional wrongs. Plaintiffs assert Saskin misrepresented comparable salaries other professional sports directors were paid in order to inflate his own salary. In an August 17, 2005 email to Linden, Saskin used these comparables to justify his proposed six-year, two-plus million dollar salary. Saskin and other defendants then "engineered" a conference call with the executive board on less than twenty-four hours notice for the purpose of approving his compensation plan. The board adopted Saskin's proposed employment terms in violation of the constitution, resulting in his compensation at more than twice other professional sports union directors. Plaintiffs also allege Saskin used Association funds to campaign for election as executive director and for ratification of his compensation plan. Further, plaintiffs contend Saskin is using his improperly-obtained position to solidify control over the Association by holding unauthorized elections for hand-picked "interim officers" and blocking access to information.

## DISCUSSION

The Association and the individual defendants move to dismiss. The Association moves on *forum non conveniens* grounds, arguing Ontario, Canada, not Illinois, is the proper forum. It asserts that dismissal is warranted because all events underlying the alleged claims took place in Ontario, most of the key witnesses and four of the five defendants reside in Canada, and Illinois has no "meaningful connection" to the case. Ass'n Memo. at 1. Alternatively, the Association moves to dismiss the fraudulent misrepresentation claim based on plaintiffs' failure to plead fraud with the

4

requisite particularity. The remaining individual defendants move to dismiss on personal jurisdiction grounds, asserting that as Canadian residents with no connection to Illinois, they do not have sufficient minimum contacts with this forum.

## I. *Forum Non Conveniens*

### A. Legal Standards

The doctrine of *forum non conveniens* allows a trial court to dismiss a case over which it would normally have jurisdiction "if it best serves the convenience of the parties and the ends of justice." *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005) (quoting *Kamel v. Hill-Rom Co., Inc.*, 108 F.3d 799, 802 (7th Cir. 1997)).

> When an alternative forum has jurisdiction to hear a case, and when a trial in the chosen forum would result in vexation and oppression to the defendant which would far outweigh the plaintiff's convenience or when the chosen forum would generate administrative and legal engagements for the trial court, the court may dismiss the case.

*Kamel*, 108 F.3d at 802. Accordingly, *forum non conveniens* analysis is a two step process. First, an adequate alternative forum must be available. *Id.* Second, the court must balance the private interests of the litigants and the public's interest in the forum. *Bridgestone/Firestone*, 420 F.3d at 704. The court has substantial flexibility in conducting its analysis and considering these factors. *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1245 (7th Cir.1990). Ultimately, "the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).

### B. Adequacy of Alternative Forum

The Association identifies Ontario, Canada, as an available and adequate alternative forum. A forum is "available" if all parties are amenable to process and are within the forum's jurisdiction.

5

*Bridgestone/Firestone*, 420 F.3d at 704. The parties do not dispute that Ontario is "available." The Association is headquartered in Toronto and its business activities occur almost exclusively in Canada. Ass'n Memo. at Ex. 1, ¶¶ 3-7. Two of the individual defendants currently work for the Association in Toronto (Saskin and Vincent Damphousse), and one is an Ontario resident (Bob Boughner). *Id.* at 4. The other individual defendants have agreed to the jurisdiction of an Ontario court. *Id.*; *see also Kamel*, 108 F.3d at 806 (finding Saudi Arabia available forum where defendant consented to jurisdiction).

The parties do not agree, however, that Ontario is an adequate forum. A forum is "adequate" if "the parties will not be deprived of all remedies or treated unfairly." *Bridgestone/Firestone*, 420 F.3d at 704. Plaintiffs vigorously dispute that Ontario is adequate, contending Canadian law precludes the Association from being sued "in *any* court in Ontario." Pl. Memo. at 4 (emphasis in original). According to plaintiffs, and attested to by their Canadian law expert, the Labour Relations Act precludes them from bringing any claims directly against the Association. *Id.* at Ex. B, ¶¶ 14-16. Instead, actions against trade unions must be brought as "representative" actions. *Id.* at 5. However, a representative action is not viable because the Association's members are not "identical in interest." *Id.* at Ex. B, ¶¶ 15,16. Plaintiffs conclude that "Ontario courts would have no jurisdiction over this or any other claim against the [Association]." *Id.* at 5. The Association, armed with its own expert, asserts trade unions can be sued in Ontario courts, and a full range of remedies is available to plaintiffs. Ass'n Memo. at 4; Ex. 7, ¶¶ 10-14.

Ontario is an adequate alternative forum. A forum is inadequate *only* if the remedy it provides "is so clearly inadequate or unsatisfactory," that "it is no remedy at all." *Piper*, 454 U.S. at 254. This is the case when "the alternative forum does not permit litigation of the subject matter

6

of the dispute." *Id.* at 255 n.22. Here, plaintiffs are able to bring actions against the Association and obtain remedies similar, albeit not identical, to those in Illinois. Plaintiffs' expert concedes that the Association may be certified as a trade union under Canadian law. Pl. Memo. at Ex. B, ¶ 10; *see also* Ass'n Memo. at Ex. 7, ¶ 11 (Association's expert cites Canadian cases where it and other professional sports associations were certified). Accordingly, the Association is governed by the Labour Relations Act and subject to the Ontario Labour Relations Board. *Id.* at Ex. B, ¶ 9; Ass'n Memo at Ex. 7, ¶¶ 12, 13. The Labour Relations Act authorizes suits for claims similar to those plaintiffs allege under the federal Labor-Management Reporting and Disclosure Act. Ass'n Memo at Ex. 7, ¶¶ 20, 26, 32 (although American statutory claim is not available, similar provisions in Canadian act provide relief). It also provides for plaintiffs' breach of contract claim. *Id.* at Ex 7, ¶¶ 16-18. Canadian common law recognizes causes of action for fraudulent misrepresentation, conversion, breach of good faith and fair dealing, and accounting. *Id.* at Ex. 7, ¶¶ 22-24, 28, 34-37, 38-44. Therefore, Ontario is not a "clearly inadequate or unsatisfactory" forum. *Piper*, 454 U.S. at 254.

Plaintiffs' contention that they are foreclosed from bringing suit directly against the Association is unavailing. First, the case cited by plaintiffs for the proposition that the Association is governed by provisional rather than federal legislation, thus precluding it from being sued, is not compelling. In the cited case, the Association conceded that provisional law applied; the issue was never affirmatively addressed by the Canadian court. *Orca Bay Hockey Ltd. P'ship v. National Hockey League*, 2006 CanLII 21166 (B.C.L.R.B). In contrast, the case cited by the Association's expert, *Public Service Alliance v. Canada (Attorney General)*, squarely addressed whether trade unions "may be parties to an action in [an Ontario] court." 62 O.R. (3d) 682 (2002). The court held

trade unions "have the legal status to bring these actions in their own names" and "have the status to be parties to these actions." *Id.* Further, the Association has been sued directly in other contexts. *See Calabrese v. Weekes*, 38 B.L.R. (3d) 221 (2003) (Association sued regarding arbitration agreement with NHL agent); *Double Hitch Enter. Ltd. v. National Hockey League*, 1994 CarswellOnt 2399 (plaintiff sued Association to enjoin it from interfering with promotion of NHL matches). The court is therefore persuaded that the Association may be sued in its own capacity in an Ontario court. Second, even assuming plaintiffs may only sue the Association in a representative action, Ontario is still an adequate forum. Plaintiffs' expert cites no authority holding that a representative action can *never* be maintained against the Association. Rather, plaintiffs establish only that they must clear certain legal obstacles prior to obtaining relief. Pl. Memo. at 5; Ex. B, ¶¶15, 16. This is the case in any forum, including Illinois. Ass'n Memo. at 4 (citing Department of Labor correspondence questioning the Labor-Management Reporting and Disclosure Act's application to a Canadian labor organization). A forum is not inadequate simply because it imposes limitations on litigants different from their chosen forum. S*ee Piper*, 454 U.S. at 255 n.22 (Scotland deemed adequate forum even though strict liability precluded and potential damages lessened). Moreover, plaintiffs allege all NHL players were harmed by the Association's actions; a representative action appears to be available.

### C. Private and Public Interest Factors

Once it is determined the alternative forum is adequate, the court must weigh the competing private and public interests involved. Private interest factors include the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses; cost of obtaining attendance of willing witnesses; possibility of viewing the premises, if applicable; and all

other practical issues that make trial of a case more efficient and economical. *Bridgestone/Firestone*, 420 F.3d at 704 (citing Gulf *Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (superceded by statute on other grounds)). Among the public interest factors are administrative difficulties from court congestion; local interests in having localized disputes decided at home; interests in having the trial of a diversity case in a forum that is familiar with the law governing the action; avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Kamel*, 108 F.3d at 803 (citing *Piper*, 454 U.S. at 241 n.6).

Plaintiffs initially argue that their decision to litigate in Illinois deserves great deference. While it is generally true that "the trial court should not supplant the plaintiff's choice of forum," a foreign plaintiff's choice deserves less deference. *Id.* (citing *Piper*, 454 U.S. at 256). Here, plaintiffs are essentially foreign to Illinois. Roloson resides in Edmonton, Canada. Compl. at ¶ 5. Klatt resides in Grand Rapids, Minnesota. *Id.* at ¶ 6. The only plaintiff who asserts residence in Illinois is Chelios. However, that assertion is contradicted by his claim to residences outside Illinois. Ass'n Memo. at 11; Ex. 1, ¶ 11 (listing Bloomfield Hills, Michigan, and Malibu, California, residences). Although Chelios plays for the Chicago Blackhawks and may own property in Illinois, his residences appear to be elsewhere. Plaintiffs have not selected a "home" forum in the usual sense. Therefore, their choice of forum is only one factor to be considered.

A careful balancing of the remaining private factors weigh in favor of Ontario as the superior forum. The main factors in assessing private interests are the convenience of the witnesses and the costs of litigation. The Association has identified 76 potential witnesses. *Id.* at Ex. 10. Not a single witness, named party or otherwise, resides exclusively in Illinois. *Id.* (one witness identified both

Ontario and Hinsdale, Illinois as his residences). In fact, 27 witnesses list Ontario as their home, and 13 are located elsewhere in Canada. *Id.* The remaining witnesses are scattered throughout the United States and abroad. *Id.* Plaintiffs' witness list consists of three non-party witnesses; two reside in Ontario. *Id.* at Ex. 11. More importantly, the likely key witnesses, Goodenow, Saskin, Linden, and employees of the Association, reside primarily in Ontario or other Canadian cities. *Id.*; *see also Pliva D.D. v. Baxter Int'l, Inc.*, No. 03 C 7371, 2003 WL 2011391, *6 (N.D. Ill. Aug. 24, 2004) (Darrah, J.) (courts should go beyond simply looking at the number of witnesses and weigh the quality and nature of the proposed testimony). The Canadian witnesses, and those living in other foreign countries, are beyond the subpoena power of this court. *See* FED. R. CIV. P. 45(b)(2); 45(c)(3). In other words, over half of the Association's, and two-thirds of plaintiffs', potential witnesses could not be compelled to testify if the trial were held in Illinois. Although plaintiffs argue letters rogatory and depositions can adequately address this problem, they have already experienced difficulty in obtaining foreign testimony. *See* Minute Order, Dkt. No. 44 (Dec. 28, 2006) (quashing plaintiffs' subpoena to Canadian resident). There is little doubt that the cost and inconvenience of holding a trial in this court would be significantly greater than litigating the matter in Ontario.

The other applicable private interest factor, access to sources of proof, also weighs in the Association's favor. In addition to problems compelling Canadian citizens to testify in Illinois, most of documentary evidence is located in Ontario. The Association's books and records are at its headquarters in Toronto. Ass'n Memo. at Ex. 1, ¶ 5. Other documentary evidence would also be located there, *i.e.*, copies of Saskin's and other defendants' correspondence regarding all aspects of the litigation, drafts of the collective bargaining agreement, and the "side letters." In addition, the Association's bank and telephone records are likely located in Canada, which may be relevant to the

10

misappropriation of funds and fraudulent misrepresentation claims. Plaintiffs are correct that this is not a complex, document-intensive case. Nonetheless, this factor weighs toward dismissal. *Kamel*, 108 F.3d at 805; *Hidrovia, S.A. v. Great Lakes Dredge & Dock Corp.*, No. 02 C 5408, 2003 WL 2004411, *3 (N.D. Ill. Apr. 28, 2003) (Plunkett, J.) (documentary proof and witnesses located in Argentina weighed heavily toward dismissal).

Similarly, public interest factors favor dismissal. The parties disagree which forum has a superior interest in the litigation. Ontario's interest clearly predominates. The corporate defendant and the main individual defendant reside and conduct business in Ontario. Ass'n Memo. at Ex. 1, ¶¶ 5, 7. The Association's meetings, aside from sporadic ones during the labor dispute, occurred in Ontario. *Id.* at Ex. 1, ¶ 13. Thirty-five Association employees live in Ontario or other parts of Canada. *Id.* at Ex. 1, ¶ 4. Canadian courts have a strong interest in regulating a labor organization operating within its boarders, as well as the organization's employees. *See Piper*, 454 U.S. at 260-61.

In addition, the vast majority of the events described in the complaint occurred or originated in Ontario. For example, the following events took place in Toronto: Saskin's "displacement" of Goodenow; the negotiation and agreement of Goodenow's buy-out; Saskin's appointment as executive director; the drafting of Saskin's compensation comparables email; negotiation and ratification of Saskin's employment contract; the players' ratification of the collective bargaining agreement; various executive board conference calls regarding Goodenow's resignation, Saskin's employment, secret ballot elections, and ratification of Saskin's employment contract; payments made to Goodenow, Saskin, and other Association employees; and the majority of Association meetings. Ass'n Memo. at 6 (citing defendants' affidavits). Further, the collective bargaining

11

agreement negotiations took place primarily in Toronto or New York, not Illinois. *Id.* The election of interim offices took place in Whistler, Canada. *Id.* at Ex. 6, ¶ 49. Tellingly, the complaint contains sparse information about where the alleged events and improper conduct occurred. Plaintiffs offer nothing to contradict the Association's numerous affidavits attesting that Ontario was the primary location of the purported events. *Id.* at Exs. 1-7.

Plaintiffs contend Illinois has an equal interest in the litigation by virtue of hosting an NHL team. According to plaintiffs, the Association's actions harmed every player; each player travels to Illinois during the NHL season when playing the Chicago Blackhawks; therefore, Illinois residents have an interest in the litigation. Pl. Memo. at 7-8. The flaws in this argument are apparent. First, only seven of 723 NHL players reside in Illinois during the off-season. Ass'n Memo. at Ex. 1, ¶ 9. Plaintiffs provide no authority for the proposition that the players' limited travel and work in Illinois creates an Illinois interest. Second, if Illinois residents can claim an interest in the litigation, so can residents of the states and Canadian provinces where the other 29 teams – including Ontario – are located. Pl. Memo. at Ex. A (two NHL teams are located in Ontario). Yet the events alleged in the complaint occurred almost exclusively in Toronto. Illinois' interest in the litigation is marginal at best compared with Ontario's "intimate involvement with this case." *Hidrovia*, 2003 WL 2004411, at *4.

The additional public interest factors weigh in the Association's favor or are equally balanced. Plaintiffs concede Canadian law will govern the complaint. Pl. Memo. at 8-9. Generally, the need to apply foreign law weighs in favor of dismissal. *See Piper*, 454 U.S. at 260. However, this court is capable of applying Canadian law when required to do so. *See Homestake Mining Co. v. Potash Corp.*, No. 91 C 5818, 1992 WL 122809, at *7 (N.D. Ill. May 26, 1992) (Anderson, J.).

12

Court congestion is not a factor. *Id.* (comparing congestion of Canadian courts and this court). The burden on Illinois residents to perform jury service weighs slightly in the Association's favor. Illinois' residents have a limited connection to this litigation; thus, they should not be burdened with jury service. *Id.* This factor, however, does not weigh heavily on the court. *Id.*

In sum, the Association advances a compelling case for dismissal. Ontario is an adequate and available alternative forum, and the private and public interests weigh strongly in its favor. While Illinois residents have a colorable interest in this case, it is a "mere passing interest" compared with Ontario. *Kamel*, 108 F.3d at 805. Therefore, the convenience of the parties and the ends of justice are best served by dismissing this case without prejudice so it may be brought in an Ontario court. *See Bridgestone/Firestone*, 420 F.3d at 703. The Association's motion to dismiss the fraudulent misrepresentation count is moot.

## II. Personal Jurisdiction

### A. Legal Standards

Plaintiffs bear the burden of proving the court has jurisdiction over the defendants. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). The court resolves all factual disputes in plaintiffs' favor and accepts as true all uncontroverted allegations made by both parties in determining whether plaintiffs have met their burden. *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983); *Allman v. McGann*, No. 02 C 7442, 2003 WL 1811531, at *2 (N.D. Ill. Apr. 4, 2003) (Norgle, J.). Plaintiffs need only make a *prima facie* showing that jurisdiction is proper. *Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc.*, 15 F.3d 721, 724-25 (7th Cir. 1994).

In order to establish jurisdiction, plaintiffs must show that bringing defendants to court in this forum satisfies: (1) the requirements of due process, characterized as "traditional notions of fair play

and substantial justice;" and (2) that the defendants are amenable to service of process. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *United States v. De Ortiz*, 910 F.2d 376, 381-82 (7th Cir. 1990). Because this is a federal question case, the due process requirement is met if "each party ha[s] sufficient minimum contacts with the United States as a whole rather than [a] particular state." *Olsen v. Jenkens & Gilchrist*, No. 05 C 4216, 2006 WL 3354132, at *8 (N.D. Ill. Nov. 17, 2006) (Castillo, J.) (citing *De Ortiz*, 910 F.2d at 382).[1] Plaintiffs do not dispute they have sufficient contacts with the United States. The parties' dispute lies with the second jurisdictional element: whether defendants are amenable to service of process. Fed. R. Civ. P. 4(k) governs the court's inquiry. *Id.* Rule 4(k) provides that service is effective to establish jurisdiction over defendants "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." FED. R. CIV. P. 4(k)(1)(A) and (D).

The Illinois long-arm statute contains a "catch-all" provision that "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714-15 (7th Cir. 2002) (citing 735 ILCS 5/2-209(c)); *see also Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000). There is no "operative difference" between the limits imposed by the Illinois constitution and the federal limits on personal jurisdiction. *Id.* at 715 (citing *RAR*, 107 F.3d at 1276). Accordingly, personal jurisdiction analysis collapses into a federal due process inquiry. *Id.* at 715-16; *Watchworks, Inc. v. Total Time, Inc.*, No. 01 C 5711, 2002 WL 424631, at *4 (N.D.

---

[1] Plaintiffs alternatively assert the court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(3). Compl. at ¶ 2. "A federal district court sitting in Illinois in a diversity case may assert personal jurisdiction if appropriate under the forum states' law." *RAR*, 107 F.3d at 1275. Both federal question and diversity cases require the same analysis with respect to personal jurisdiction. *See infra.*

14

Ill. Mar. 19, 2002) (Lefkow, J.). A finding of personal jurisdiction therefore requires the following:

> [T]he defendant must have minimum contacts with the forum state such that the maintenance of the suit does not offend fair play and substantial justice. Those contacts may not be fortuitous. Instead, the defendant must have purposefully established minimum contacts within the forum State before personal jurisdiction will be found to be reasonable and fair. Crucial to the minimum contacts analysis is a showing that the defendant should reasonably anticipate being haled into court [in the forum State], because the defendant has purposefully avail[ed] itself of the privilege of conducting activities there.

*Id.* at 716 (internal quotations and citations omitted); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985); *International Shoe*, 326 U.S. at 316.

The federal test is met by demonstrating "general" or "specific" personal jurisdiction. *Id.* at 713. General jurisdiction occurs when the defendant has "continuos and systematic general business contacts" with the forum state. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003). In determining specific jurisdiction, the court asks whether it is "fundamentally fair" to require the defendant to submit to jurisdiction with "respect to this litigation." *Id.* at 780 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). The most important factor is foreseeability; "that is, whether the defendant[s] could have anticipated being haled into the courts of the state." *Olsen*, 2006 WL 3354132, at *9. Purposeful availment of the privileges of conducting activities in the state makes the defendant amenable to jurisdiction. *Purdue*, 338 F.3d at 780. In making the determination, courts examine whether defendants have deliberately engaged in significant activities or created continuing obligations within the forum state. *Id.* at 780-81.

## B. Specific Jurisdiction

Plaintiffs concede the individual defendants' contacts with Illinois are not sufficient to support general jurisdiction. Instead, plaintiffs argue defendants' contacts are enough to confer specific jurisdiction. Plaintiffs contend defendants "knowingly benefitted from the membership of the players on the Chicago Blackhawks and/or other residents of Illinois . . . [and] must have foreseen that their tortuous and otherwise wrongful conduct would injure all NHL players, including residents of Illinois and subject them to litigation within Illinois." Pl. Memo. at 4. Plaintiffs' argument rests on the theory that defendants knowingly injured all NHL players, who traveled to Illinois for hockey games. Defendants respond that plaintiffs must show that the complaint's causes of action "arise out of the specific contacts between the defendant[s] and the forum state." Def. Memo. at 11 (citing *RAR*, 107 F.3d at 1278). Because the alleged events did not occur in Illinois, defendants argue plaintiffs cannot meet their burden to show defendants have "sufficient minimum contacts" with this forum. *Id.* at 12.

Defendants advance the better argument. As detailed above and attested to in defendants' affidavits, virtually none of the events alleged in the complaint occurred in Illinois. The complaint sets forth nine independent events underlying seven causes of action. Compl. at 2-3, ¶¶ 51-94. The specific allegations charge Saskin with the majority of the wrongful acts. *See e.g.*, *id.* at ¶¶ 29 ("Saskin displaced and replaced Goodenow"), 34 ("Saskin and Linden offered Goodenow a buy-out"), 36 ("Saskin proclaimed himself Executive Director). However, the complaint provides no indication where the acts occurred. According to Saskin's and the other defendants' uncontroverted affidavits, they did not commit any of the alleged acts in Illinois. Def. Memo. at Exs. 1-5. The only proof plaintiffs offer to contradict the affidavits is two group exhibits indicating Saskin attended

meetings in Illinois. Pl. Memo. at Exs. D, E. The exhibits show that Saskin, not the other defendants, attended only three meetings over approximately a year. *Id.* Two of the meetings occurred prior to July 28, 2005, the date Saskin allegedly took control of the Association. *Compare* Compl. at ¶ 29 *with* Pl. Memo. at Ex. 5, ¶¶ 19-24. Thus, Saskin's sole contact with Illinois during the relevant time period was for a business meeting not central to this case. Under these circumstances, he simply does not have contacts with Illinois sufficient to give him fair warning he may be hailed into court here. *See Burger King*, 471 U.S. at 472-73. The other defendants' contacts with Illinois are even less.

The court recognizes that defendants are not required to physically enter Illinois to be subject to jurisdiction. *Id.* at 476. It is enough if they purposefully directed their actions toward Illinois. *Id.* This prompts plaintiffs to employ their "jurisdiction via the Blackhawks" theory. The theory fails for familiar reasons. By plaintiffs' reasoning, every federal district with a professional hockey team can assert specific jurisdiction over defendants *in this case*. But that cannot be, because other district courts with NHL teams also have no connection with the events alleged. "Specific jurisdiction cannot lie without a connection between the defendants' [Illinois] activity and the claims alleged in the complaint." *Steel Warehouse v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998). No connection is present here. Therefore, personal jurisdiction over defendants is not constitutionally permissible.

## CONCLUSION

The National Hockey League Players' Association's motion to dismiss on *forum non conveniens* grounds is granted, and its motion to dismiss plaintiffs' fraudulent misrepresentation claim is moot. The motion to dismiss for lack of personal jurisdiction by Ted Saskin, Trevor Linden,

17

Vincent Damphousse, Bob Boughner, and Bill Guerin is granted. This case is dismissed without prejudice.

ENTER:

_Suzanne B. Conlon_
Suzanne B. Conlon
United States District Judge

January 18, 2007